**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **DUSTIN MCCOY,** | : | |
| **Plaintiff,** | : | Case No. 2:09-cv-00323 |
| **v.** | : | Judge Holschuh |
| **PATROLMAN ANDREW BURNS,** et al., | : | Magistrate Judge King |
| | : | |
| **Defendants.** | : | |
| | : | |

## MEMORANDUM OPINION AND ORDER

Following his conviction for disorderly conduct, Plaintiff Dustin McCoy filed suit under 42 U.S.C. § 1983 against his arresting officers, Defendants Andrew Burns and R. Matt Jones. Plaintiff seeks recovery for violations of his constitutional rights which allegedly occurred during the course of his arrest. This matter is currently before the Court on Defendants' motion for summary judgment. (Doc. # 19). For the reasons that follow, that motion is **DENIED**.

## I. Background

On the evening of May 10, 2008, Plaintiff Dustin McCoy and his fiancée Kathryn Shults left their home in Mount Vernon, Ohio, for a night of drinking and dancing at a local bar named Banana Joe's. (McCoy Dep. pp. 53, 57; McCoy Aff. ¶ 12). Shortly before midnight, the couple was standing outside the bar when an unfamiliar woman approached them. (McCoy Dep. p. 58). Allegedly without provocation, the woman slapped Plaintiff across his face. (McCoy Dep. pp. 58, 60). Moments later, the woman's boyfriend appeared and also confronted Plaintiff. (McCoy Dep. p. 64). After a brief exchange, the man tackled Plaintiff, and soon, five or six men were

holding Plaintiff to the ground.  (McCoy Dep. pp. 64–65). Eventually the scuffle dispersed

without police intervention, and Plaintiff sought refuge in a nearby alley. (McCoy Dep. p. 65).

Even though Plaintiff admits he was drunk before the altercation, he claims that

afterwards "he was clear-headed" and "didn't feel drunk." (Id.). Sober or not, Plaintiff drove

Shults home in his pickup truck. (McCoy Dep. pp. 58, 65–66). When he pulled onto their

property, Plaintiff was angry and allegedly slammed his truck door so hard that the driver's side

window shattered.  (McCoy Dep. p. 68). After the two went inside, Shults realized that

Plaintiff's arm was bleeding and went to grab him a towel.  (Id.). However, when Plaintiff

noticed his arm, he fainted. (Id.).

Meanwhile, Defendants Andrew Burns and R. Matt Jones were dispatched to Plaintiff's

residence in their capacity as Mount Vernon city police officers on a domestic disturbance call.

(Burns Aff. ¶¶ 3–4; Jones Aff. ¶¶ 3–4). Defendants were advised someone had driven a truck

onto Plaintiff's lawn and that sounds of "breaking glass and yelling" followed. (Jones Aff. ¶ 4).

When Defendant Jones arrived, Shults invited him inside and assured him that no domestic

violence had occurred. (Jones Aff. ¶ 7; Shults Aff. ¶ 26). In the hallway, Defendant Jones saw

Plaintiff lying unconscious on the floor with cuts on his left arm and right knuckles. (Jones Aff.

¶ 7; Jones Aff. Ex. 1; Shults Aff. ¶ 28). Defendant Jones called for medical assistance, but before

the medics arrived, Plaintiff regained consciousness. (Jones Aff. Ex. 1; Shults Aff. ¶¶ 29–30).

At this point, the witness accounts begin to diverge. For instance, Plaintiff recalls:

> Jones had walked in the house and was standing above me as I'm
> coming to, and I'm looking at him, and he said, "Are you all right?"
> I said, "I'm fine." He said,"Let's go outside  so you can get some
> fresh air." I stood up on my own, walked right out, and I sat down
> right on my own and was perfectly fine until Burns pulled into the
> driveway.

2

(McCoy Dep. p. 68). Shults confirms this account, noting that "before Officer Burns arrived, when Dustin and I were talking to Officer Jones only, it seemed to me that Dustin and Officer Jones got along with each other very well, and very calmly." (Shults Aff. ¶ 39). Conversely, Defendant Jones reports that Plaintiff "got up and started stating he was going to go back to the bar and 'Fucking kill the mother fuckers that jumped him.'" (Jones Aff. Ex. 1). Although Shults denies that Plaintiff said this, Plaintiff admits that when Defendant Jones refused to take him to Banana Joe's to identify his alleged assailants, Plaintiff was "irritated." (McCoy Aff. ¶ 16; Shults Aff. ¶ 48).

When Defendant Burns arrived, the situation only worsened. Plaintiff claims that Defendant Burns immediately "started cussing" at Plaintiff, while Defendant Burns maintains that Plaintiff "was intoxicated and kept standing up, throwing his arms up, and yelling that he was going to kill the 'mother fuckers' who jumped him and broke his truck window at the bar." (Burns Aff. Ex. 1; McCoy Aff. ¶ 18). According to Defendant Jones, Plaintiff exclaimed that "the fucking police need to go do their job or I am going to go back to the bar and fucking kill those mother fuckers." (Jones Aff. Ex. 1). Shults specifically denies the latter statement. (Shults Aff. ¶ 49). Additionally, Plaintiff claims that he never "threatened to return to the bar and kill anyone." (McCoy Aff. ¶ 46).

The medics soon arrived and tended to Plaintiff's arm. (Shults Aff. ¶ 33). Although Defendant Jones claims that Defendants had to tell Plaintiff to sit down so that the medics could treat him, Shults insists that Plaintiff "calmly allowed" the medics to clean and bandage his arm. (Jones Aff. Ex. 1; Shutls Aff. ¶¶ 43, 70). Thereafter, Defendant Jones alleges that Plaintiff "started to shake his bloody hand in Ptl. Burns [sic] face in an attempt to tell his version of the

fight that took place at the bar." (Jones Aff. Ex. 1). However, Plaintiff and Shults insist that Plaintiff's arm had stopped bleeding once it was bandaged. (McCoy Aff. ¶ 17; Shults Aff. ¶ 35). Shults further adds that Plaintiff "did not spray blood around" after the medics cleaned and bandaged his arm. (Shults Aff. ¶ 43).

Defendant Jones recalls that when Defendants warned Plaintiff about his disorderly behavior, Plaintiff responded by saying "Fuck the Police they [sic] are stupid mother fuckers." (Jones Aff. Ex. 1). Plaintiff acknowledges that he said this and that he continued to beg the Defendants to take him to Banana Joe's. (McCoy Aff. ¶ 19; McCoy Dep. p. 72). Defendants suggested that Plaintiff "sober up and come to the station in the morning to complete a report." (Jones Aff. Ex. 1; McCoy Aff. ¶ 20). Defendant Jones further alleges that Plaintiff said "Fuck that I am going to go kill those mother fuckers with my ball bat." (Jones Aff. Ex. 1). Shults disputes this, claiming that Plaintiff said only that he "ought" to do so. (Shults Aff. ¶ 51).

Defendants allege that they told Plaintiff to go inside several times or face arrest. (Burns Aff. Ex. 1; Jones Aff. Ex. 1). They also claim that when Plaintiff finally went inside, he "turned all the lights off" began "opening the windows to yell at neighbors." (Burns Aff. Ex. 1; Jones Aff. Ex. 1). Defendants also accuse Plaintiff of cursing at his neighbors and "directing obscene and threatening gestures at them." (Burns Aff. ¶ 8; Jones Aff. ¶ 10). Defendant Burns claims that "there were numerous neighbors outside their houses" due to the disturbance. (Burns Aff. ¶ 8). Shults takes issue with these allegations, insisting that their neighbors were outside to see the ambulance and returned inside when the medics left. (Shutls Aff. ¶ 41). Shults also specifically denies that Plaintiff made obscene gestures towards their neighbors or Defendants and denies that Plaintiff ever threatened the neighbors or Defendants. (Shults Aff. ¶ 42). Plaintiff admits,

however, that once inside, he "let the officers know in colorful language that [he] did not believe they were treating [him] fairly, and were not doing their jobs as police officers." (McCoy Aff. ¶ 23).

Once Plaintiff was inside, Defendant Jones reports:

> Ptl. Burns was talking to Shults on the back porch when McCoy again opened the door and demanded that we leave his property and not to talk to Shultz [sic]. Ptl. Burns again warned McCoy on his conduct and told him to get back in the residence and to be quiet. McCoy responded with "it's my house you [sic] can't tell me to shut my door". [sic] Ptl. Burns again advised McCoy to shut the door or go to jail. McCoy failed to shut the door until Ptl Burns walked in his direction.

(Jones Aff. Ex. 1). Shults claims that Plaintiff told her to "come inside and stop talking to the police so they would go away." (Shults Aff. ¶ 54). Shults adds that she "urged the police to leave [their] property too." (Id.). Once inside, Shults claims that Plaintiff agreed to go to bed and began turning off their lights. (Shults Aff. ¶¶ 77, 79).

Despite the demands to leave, Defendants remained on the premises. After Shults went inside, Defendant Jones began taking pictures of Plaintiff's truck. (Burns Aff. Ex. 1; Jones Aff. Ex. 1). According to Defendant Jones:

> While I was photographing McCoy again opened the door and started yelling at us and demanding to know what was going on and why we were messing around with his truck. Ptl. Burns and I approached the back door and advised McCoy to step out of the residence that he has had all the warnings he was going to get for disorderly conduct and that he was going to jail. McCoy refused to come outside but continued to slam on the police and state how he was going to "kill the mother fuckers at Banana Joes [sic] that beat him up." McCoy then threw his arm out enough were [sic] Ptl. Burns was able to grab it in an attempt to get control of McCoy as he advised him he was under arrest. McCoy then ran back into his residence as he resisted arrest. Ptl. Burns and I got control of McCoy in the hallway and were able to secure him in handcuffs.

5

(Jones Aff. Ex. 1). Defendant Jones claims that after searching Plaintiff for weapons, Defendants

placed Plaintiff in the back of a patrol car and drove him to the sheriff's office in Knox County,

Ohio. (Id.).

Defendant Burns tells a similar story:

> Ms. Shults had gone inside and Ptl. Jones took some photographs of
> the truck window, as well as the broken glass from it in the driveway.
> When [Plaintiff] came to the back door and opened it to yell and
> curse, he was again warned. The defendant closed the door but came
> back and opened it. The defendant was yelling and I walked up on the
> back porch. The defendant closed the door but remained there. There
> was no blind or window shade on the 9-light door so I stood there and
> addressed [Plaintiff]. I told the defendant to open the door and he did.
> I told the defendant to step outside and he said no. I again told the
> defendant that he would be jailed if he continued with this type of
> conduct.

(Burns Aff. Ex. 1). He continues:

> When I made the decision to arrest Mr. McCoy, he was in the
> threshold of the doorway to his house. He had previously gone
> around the house multiple times in a pattern, so that Officer Jones and
> I knew that he was likely coming around again. Each time the pattern
> seemed the same. He would go around the house opening windows,
> swearing at and making obscene gestures at his neighbors, and then
> he slammed the windows again. He made his way around the house
> until he got to the back door, when he opened the door, and began to
> swear at Officer Jones and me. When he opened the door and began
> to swing his arms around, close enough to me to cause me to believe
> he might make contact with me or at least cause his blood to get on
> me, I grabbed his arm to arrest him.

(Burns Aff. ¶ 12).

However, Plaintiff and Shults recount a different set of events. They claim that while

Plaintiff was turning off the lights in their home, Plaintiff noticed Defendant Jones near his

truck. (McCoy Aff. ¶ 28; Shults Aff. ¶ 44). Plaintiff acknowledges that he went to his back door

to yell and gesture at Defendant Jones from inside the home. (McCoy Aff. ¶¶ 28, 31). Allegedly,

6

as Plaintiff gestured with his arm out the door, Defendant Burns grabbed it without warning and simultaneously kicked the door into Plaintiff's face, knocking him inside. (McCoy Aff. ¶¶ 29–31). Plaintiff denies knowing that Defendant Burns was nearby and denies waving "a bloody hand or arm" near Defendant Burns. (McCoy Aff. ¶ 43). Shults maintains that Defendant Burns was "[hiding] in the darkness beside the doorway," having unscrewed their porch light. (Shults Aff. ¶¶ 46, 55). In his deposition, however, Plaintiff tells a slightly different story, claiming that Shults was attempting to open the back door to tell Defendants to leave when:

> I stopped her from opening the door. As I nudged her out of the way, I grabbed the door, Burns was here. He stepped around and kicked the door in the corner as I'm pulling on it. I didn't have the door open 7, 6 to 7 inches tops, and the door came back, busted me in my mouth. I fell back.

(McCoy Dep. 37).

Once inside, Defendant Burns maintains that Plaintiff "was resisting, thrashing around, trying to get away, kicking with his legs and throwing his arms around" while Defendants attempted to arrest him. (Burns Aff. ¶ 14). Defendant Burns also recalls that he was concerned to be in Plaintiff's kitchen, "due to the presence of knives and other potentially life threatening implements" in addition to believing that Plaintiff had a baseball bat in his home. (Id.). Defendant Burns recalls:

> During the course of our arrest . . . I used the amount of force necessary to subdue Mr. McCoy, but no more. Mr. McCoy was very drunk, belligerent, and was actively resisting arrest. Mr. McCoy was young, fit, and he was wiry strong. He was intoxicated, agitated and actively bleeding. Given these factors, Mr. McCoy posed a danger to both me and to Officer Jones, as well as to other members of the public.

(Burns Aff. ¶ 13). He also states:

> [Plaintiff] was going back into the kitchen but I remained with him telling him to stop as I held onto him. [Plaintiff had turned and was trying to get away from me and yelled no. I took [Plaintiff] to the floor and told him several times to stop resisting. Ptl. Jones was in the house as well and subsequently we handcuffed [Plaintiff].

(Burns Aff. Ex. 1).

However, Shults insists that Plaintiff "never tried to hurt [Defendants] once they grabbed him and took him to the floor" and that Plaintiff "did not kick anyone or try to do so, or throw his arms about." (Shults Aff. ¶ 68). She also maintains that Plaintiff never said "no," that he did not "try to get away from" Defendant Burns, and that Defendant Burns never told Plaintiff "to stop doing anything." (Shults Aff. ¶75).

Plaintiff claims that once on the floor, he was maced at point-blank range and temporarily blinded. (McCoy Aff. ¶ 33). Although Plaintiff admits he "had somehow squirmed out from underneath" Defendant Burns, he claims that he was still on the floor when he was clubbed "in the head multiple times with a police flashlight," which caused him to lose consciousness. (McCoy Aff. ¶ 34; McCoy Dep. p. 40). Plaintiff remembers waking up while Defendants were dragging him outside across his concrete porch in one handcuff. (McCoy Aff. ¶¶ 37, 39). Allegedly, Defendants then tossed Plaintiff two and a half to three feet off his porch and onto the ground. (McCoy Aff. ¶¶ 37–38). Plaintiff complains that he was injured when Defendants dragged him across his back door threshold which protrudes about two and a half inches. (McCoy Dep. p. 40). Once in the yard, Plaintiff admits that he was  "still trying to get away a little bit." (McCoy Dep. p. 41). Plaintiff claims that Defendants then "slammed" him against the side of a police cruiser. (McCoy Aff. ¶ 39). Allegedly after Defendants placed the other handcuff on Plaintiff, they then threw him against the cruiser's door jam before taking him to jail. (McCoy

8

Aff. ¶ 40). At no time did Defendants present Plaintiff with an arrest or search warrant or claim

to have one. (McCoy Aff. ¶ 35).

Plaintiff pleaded no contest to persisting disorderly conduct and was convicted of the

fourth degree misdemeanor by the Mount Vernon Municipal Court on January 15, 2009. He was

represented by counsel during these proceedings. This suit followed.

## II. Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the

Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of

every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the
> pleadings, the discovery and disclosure materials on
> file, and any affidavits show that there is no genuine
> issue as to any material fact and that the movant is
> entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a

matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains

for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury

if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467

(1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also

Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine

if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir.

1978). The court's duty is to determine only whether sufficient evidence has been presented to

make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

10

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

**III. Discussion**

Plaintiff seeks recovery under 42 U.S.C. § 1983, claiming that Defendants arrested him in his home without a warrant and used excessive force during the course of that arrest. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. This statute creates no substantive rights, "but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393–94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). Thus to prevail, Plaintiff must establish that a person acting under color of state law deprived him of rights secured by the Constitution or laws of the United States. Smoak v. Hall, 460 F.3d 768, 777 (6th Cir. 2006).

In moving for summary judgment, Defendants assert the defense of qualified immunity. Under this legal doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity serves as both "a defense against liability" and "an entitlement not to stand trial or face the other burdens of litigation." Morrison v. Bd. of Trs. of Green Twp., 583 F.3d 394, 400 (6th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 200–01 (2001); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue

interference with their duties and from potentially disabling threats of liability.'" Elder v.
Holloway, 510 U.S. 510, 514 (1994) (quoting Harlow, 457 U.S. at 806).

Once a defendant raises this defense, the plaintiff bears the burden of proving that the
defendant is not entitled to qualified immunity. Smoak, 460 F.3d at 778. "A defendant enjoys
qualified immunity on summary judgment unless the facts alleged and the evidence produced,
when viewed in the light most favorable to the plaintiff, would permit a reasonable jury to find
that: (1) the defendant violated a constitutional right; and (2) the right was clearly established."
Morrison, 583 F.3d at 400. Although the Court may consider these elements in either order, there
is no reason to depart from the traditional sequence in this case. See Pearson v. Callahan, 129 S.
Ct. 808, 818 (2009). The Court now turns to analyze whether Defendants are entitled to qualified
immunity with respect to Plaintiff's claims of unlawful arrest and excessive force.

### A) Unlawful Arrest

### 1) Whether a constitutional violation occurred

In his first claim, Plaintiff alleges that Defendants arrested him in his home without a
warrant in violation of the Fourth and Fourteenth Amendments to the United States Constitution.
The Fourth Amendment secures the right to remain free from unreasonable seizures, and the
Fourteenth Amendment applies this guarantee against the states. U.S. Const. amend. IV; Mapp v.
Ohio, 367 U.S. 643 (1961). Generally, police officers may arrest suspects for misdemeanors
when an officer has probable cause to believe the offense was committed in his or her presence.
See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). However, an officer may not arrest
a suspect in the suspect's home without a warrant, consent to enter, or exigent circumstances.
Payton v. New York, 445 U.S. 573, 588–89, 590 (1980) (observing that in-home arrests involve

13

"not only the invasion attendant to all arrests but also an invasion into the sanctity of the home"). "Payton and Atwater, taken together, clearly establish that warrantless in-home arrests for misdemeanor offenses absent consent or exigency violate the Fourth Amendment." Denton v. Rievley, 353 F. App'x 1, 6 (6th Cir. 2009).

### i) Whether there was probable cause

Although Plaintiff claims that Defendants lacked probable cause to arrest him, this issue has already been resolved in Defendants' favor. "Issue preclusion, or collateral estoppel, bars subsequent relitigation of a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact or issue is presented in a subsequent suit." Cobbins v. Tennessee Dep't of Transp., 566 F.3d 582, 589 (6th Cir. 2009). "Federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state." Abbot v. Michigan, 474 F.3d 324, 330 (6th Cir. 2007) (citing 28 U.S.C. § 1738). Plaintiff was convicted of persisting disorderly conduct by the Mount Vernon Municipal Court, an Ohio state court. Therefore, the Ohio law of collateral estoppel controls this issue.

"In Ohio, collateral estoppel applies 'when the fact or issue (1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action.'" Daubenmire v. City of Columbus, 507 F.3d 383, 389 (6th Cir. 2007) (quoting Thompson v. Wing, 637 N.E.2d 917, 923 (Ohio 1994)). "However, a prior state action will not preclude litigation in federal court when the litigant against whom the preclusive effect is sought did not have a full and fair opportunity to litigate the claims or issues decided by the state courts." Id. at 389.

14

A finding of guilt by a state court may estop plaintiffs from asserting in federal court that defendant police officers acted without probable cause. Walker v. Shaeffer, 854 F.2d 138, 142 (6th Cir. 1988). In Walker, a § 1983 plaintiff had been convicted of disorderly conduct in state court after pleading no contest to the charge. Id. at 139–40. He subsequently filed suit in federal court, claiming that his arresting officers had lacked probable cause to arrest him. The Sixth Circuit held that his plea of no contest and resulting conviction precluded him from later asserting that the officers had lacked probable cause. Id. at 142. The court of appeals noted that the plaintiff had been represented by counsel in his criminal proceedings and that there was no indication he had lacked a reasonable and fair opportunity to litigate the issue of probable cause before the state court. Id. at 142–43.

In this case, Plaintiff was represented by counsel when he pleaded no contest to persisting disorderly conduct in violation of Mount Vernon, Ohio, Codified Ordinances § 509.03(B)&(E). The Mount Vernon Municipal Court found him guilty, and there is no indication that Plaintiff, represented by counsel at those proceedings, lacked a reasonable and fair opportunity to litigate the issue of probable cause. Therefore, Plaintiff is collaterally estopped from denying that Defendants lacked probable cause to arrest him.[1]

### ii) Whether there must have been consent or exigent circumstances

---

[1] Defendants also argue that Plaintiff is barred from relitigating the issue of probable cause under Heck v. Humphrey, 512 U.S. 477 (1994). The Heck doctrine is implicated when a suit filed under § 1983 would "'necessarily' imply the invalidity of a conviction. Schreiber v. Moe, 596 F.3d 323, 335 (6th Cir. 2010). However, the Court need not address the applicability of Heck in this instance because the doctrine of collateral estoppel settles the issue.

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton, 445 U.S. at 590. See also U.S. Const. amend. IV ("The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . ."). There is no dispute that Plaintiff was standing inside his home when Defendant Burns initiated the arrest. However, Defendants claim that when Defendant Burns initiated the arrest while Plaintiff was standing "at the threshold of his doorway," he had not entered the home. (Doc. # 19, p. 12). Defendants argue that without entry, there was no need for a warrant, consent to enter, or exigent circumstances. Therefore, the Court must determine whether Plaintiff relinquished his Fourth Amendment protections attendant to his home by standing "at the threshold," even though he was standing inside when his arrest was initiated. If he did, probable cause alone would justify his arrest. See Atwater, 532 U.S. at 354. Otherwise, there also must have been consent or exigent circumstances to justify the warrantless entry and resulting seizure. See Payton, 445 U.S. at 590.

Four years before Payton, the Supreme Court reviewed a warrantless doorway arrest in United States v. Santana, 427 U.S. 38 (1976). In Santana, police officers approached a suspect standing in her doorway without an arrest warrant. Id. at 40. As the suspect ran back into her house, the officers followed and captured her in the vestibule of the home. Id. The Sixth Circuit recently explained that in finding that the suspect's doorway was a public place, the Supreme Court "emphasized the interplay between an individual's expectation of privacy and the demarcation of the home." Denton, 353 F. App'x at 5.

> Integral to the Court's analysis was a finding that Santana was not merely visible to the public but was as exposed to public view,

16

> speech, hearing, and touch as if she had been standing completely
> outside her house, and thus had no legitimate expectation of privacy
> at the time the police initiated the arrest.

Id. (quoting Cummings v. City of Akron, 418 F.3d 676, 686 (6th Cir. 2005)). Therefore, the

officers reasonably initiated the doorway arrest upon probable cause alone.[2]

More recently in Cummings, two police officers were investigating an alleged domestic

disturbance when they knocked on a suspect's door without a warrant. The suspect appeared at a

window near the door and asked what the officers wanted. The suspect then partially opened the

front door and briefly spoke with the officers. They asked to come inside, but the suspect

refused. When one of the officers noted the smell of marijuana emanating from the home, the

suspect tried to close the door. However, the officer blocked the door with his foot, and the

officers gained entry and arrested the suspect. Distinguishing Santana, the court found that the

suspect's actions had "manifested his intent to keep the inside of his home private." Id. at 685.

Therefore, absent consent and exigent circumstances, the court concluded that the officers had

violated the suspect's right to remain free from unreasonable seizure. Id. at 687.

Later in Denton, the Sixth Circuit considered a case where a suspect opened his front

door expecting his wife, but instead found a police officer investigating a domestic violence

report. 353 F. App'x at 2. The officer did not have a warrant. After a brief exchange while the

suspect remained inside, the officer reached across the threshold to arrest him. Despite the fact

that the suspect had opened the door voluntarily, the Sixth Circuit held that his behavior was

consistent with an intention to remain private because he had been expecting his wife and not an

"outsider." Id. at 5. Therefore, he demonstrated "an attempt to maintain a privacy interest in his

---

[2] The Court held that the ultimate arrest was reasonable under the exigent circumstance of a hot
pursuit. Santana, 427 U.S. at 43.

17

home." Id. See also United States v. Saari, 272 F.3d 804 (6th Cir. 2001) (defendant did not voluntarily expose himself to the public by answering the door following forceful knocks by officers positioned outside with guns drawn). Cf. United States v. Gori, 230 F.3d 44 (2d Cir. 2000), cited with approval but distinguished in Saari (defendant forfeited expectation of privacy when he voluntarily opened his front door for a delivery woman).[3]

Here there is no dispute that Plaintiff and Shults ordered Defendants off their property and that Defendants ignored their demands. Plaintiff claims that as he was getting ready for bed, he noticed Defendant Jones still on his property inspecting his truck. Allegedly in response, Plaintiff opened his back door to yell and gesture at Defendant Jones from within his home, demanding that Defendant Jones leave his truck alone. Plaintiff asserts that then, without warning, Defendant Burns emerged from the darkness and grabbed Plaintiff's arm when it crossed the threshold. In his deposition, Plaintiff recalls that Defendant Burns kicked the back door in the corner as Plaintiff was attempting to stop Shults from opening the door. Neither officer alleges that Plaintiff was outside when Defendant Burns reached for Plaintiff's arm.

Viewing the evidence produced in the light most favorable to Plaintiff, as the Court is required to do, Plaintiff acted consistently with an attempt to remain private. When Defendants

---

[3] For support, Defendants point to United States v. Archibald, 589 F.3d 289 (6th Cir. 2009) and United States v. Kinney, 638 F.2d 941 (6th Cir. 1981), arguing that these cases show that doorway arrests are "outside" arrests for purposes of Payton. However, these cases are unpersuasive. The police obtained a search warrant in both cases, and the limited analysis on the issue was to determine the scope of post-arrest protective sweeps under Maryland v. Buie, 494 U.S. 325 (1990), not whether the protections articulated in Payton were applicable. Defendants also cite, without explanation, United States v. Henry, 48 F.3d 1282 (D.C. Cir. 1995); United States v. Watson, 273 F.3d 599 (5th Cir. 2001); United States v. Oguns, 921 F.2d 442 (2d Cir. 1990); United States v. Wilson, 306 F.3d 231 (5th Cir. 2002); and United States v. McLemore, No. 05-CR-226, 2006 U.S. Dist. LEXIS 13335 (E.D. Wis. Mar. 7, 2006). These cases also concern Buie and not Payton, and thus are not persuasive.

remained on the premises without a warrant, Plaintiff protested their presence from within his home. According to Plaintiff, he was inside his home when he yelled out that he did not believe Defendants were treating him fairly and not doing their jobs as police officers. According to his companion, Shults, Plaintiff told her to come inside the house and stop talking to the police "so they would go away," and Shults testified that she "urged the police to leave [their] property too." Officer Jones testified that, instead of leaving the property, he was photographing Plaintiff's truck when Plaintiff yelled at the officers demanding to know why they were "messing around with his truck." According to Jones, he and Officer Burns then went to the back door and ordered Plaintiff to come outside the residence because he was going to jail. Plaintiff, however, refused to come outside but "threw his arms out enough that Burns was able to grab it." Plaintiff then "ran back into the residence" and the officers went in an d "got control of McCoy in the hallway." Both Jones and Burns were inside the house when Plaintiff was thrown to the floor and handcuffed.

Although Plaintiff's yelling and gesturing may have exposed Plaintiff to view by his neighbors, this "attempt to maintain a privacy interest in his home" was in direct response to Defendants' intentional disregard of the sanctity of his home. See Denton, 353 F. App'x at 5. Cf. 3 W. LaFave, Search and Seizure § 6.1(3), p. 304 (4th ed. 2004) ("But if in a particular case . . . the intended arrestee at the door elects to exercise the security of the premises by not submitting to the arrest, then it is hardly unfair that the police should be required to withdraw and return another time with a warrant."). Plaintiff did not relinquish his Fourth Amendment rights attendant to his home by affirming his expectation of privacy from within it.  Therefore, in addition to probable cause, there must have been either consent or exigent circumstances to

justify the warrantless entry to seize Plaintiff under the Fourth Amendment. See Payton, 445

U.S. at 589–90; Denton, 353 F. App'x at 6.

### iii) Whether there was consent or exigent circumstances

Defendants claim that they had consent to enter Plaintiff's home, and thus, did not need a

warrant. This argument is completely without merit. Defendants remind the Court that "Officer

Jones had previously been invited into the house by McCoy's financé [sic]." However, this

invitation obviously was revoked when Plaintiff and Shults told Defendants to leave their

property. Any consent Defendant Jones had before being told to leave is irrelevant as to whether

Defendants had consent to enter when the arrest was initiated. Cf. Painter v. Robertson, 185 F.3d

557, 567 (6th Cir. 1999) ("Although a premises search conducted pursuant to valid consent

cannot violate the Fourth Amendment, the consenting party may limit the scope of that search,

and hence at any moment may retract his consent.") (internal citations omitted).

Defendants also argue that exigent circumstances justified their warrantless entry. The

Sixth Circuit has held:

> In general, exigent circumstances exist when real immediate and
> serious consequences would certainly occur if a police officer were
> to postpone action to get a warrant. The exigent circumstances
> exception relies on the premise that the existence of an emergency
> situation, demanding urgent police action, may excuse the failure to
> procure a . . . warrant. We have identified the emergency situations
> giving rise to the exigent circumstances exception to the warrant
> requirement as (1) hot pursuit of a fleeing felon, (2) imminent
> destruction of evidence, (3) the need to prevent a suspect's escape, or
> (4) a risk of danger to the police or others.

United States v. McClain, 430 F.3d 299, 304 (6th Cir. 2005) (citations and internal quotations

omitted). The Supreme Court has emphasized that "exceptions to the warrant requirement are

few in number and carefully delineated, and that the police bear a heavy burden when attempting

to demonstrate an urgent need that might justify warrantless searches or arrests." Welsh v. Wisconsin, 466 U.S. 740, 749–50 (1984) (internal quotations and citations omitted). The Welsh Court also expressed "hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue" and when the underlying offense is "relatively minor." Id. at 750.

Viewing the evidence produced in the light most favorable to Plaintiff, no exigent circumstances justified the warrantless entry to arrest Plaintiff for disorderly conduct. Although Defendants insist the "entry was made in pursuit of a fleeing suspect," the evidence does not support this argument. Although Plaintiff refused to come outside when ordered to do so, there is no indication that Plaintiff was attempting to flee Defendants. On the contrary, he allegedly was standing in his doorway, yelling at Defendant Jones, and unaware that Defendant Burns was nearby. See, e.g., Cummings, 418 F.3d at 686 ("Typically, hot pursuit involves a situation where a suspect commits a crime, flees and thereby exposes himself to the public, attempts to evade capture by entering a dwelling, and the emergency nature of the situation necessitates immediate police action to apprehend the suspect."). Plaintiff did not attempt to evade capture by entering his home; he was already in it before Defendants decided to arrest him. Defendants do not indicate what the emergency nature of the situation was that necessitated immediate police action. Therefore, viewing the submitted evidence does not support a finding that these circumstances were present.

Defendants also claim that Plaintiff posed a risk of danger to themselves and the public. Specifically, they allege Plaintiff: (1) waived his bleeding arm near Defendant Burns while gesturing at Defendant Jones, (2) threatened his neighbors, and (3) intended to return to Banana

21

Joe's and kill his alleged assailants. However, Plaintiff and Shults dispute these allegations in their affidavits. Furthermore, even if true, these assertions do not raise immediate risks of danger. Defendant Burns could have stepped away from the door to avoid any blood, and there is no indication Plaintiff could have harmed his neighbors or his alleged assailants from his doorway. Viewing the evidence produced in the light most favorable to Plaintiff, Plaintiff posed no risk of danger to Defendants or the public so long as he remained inside his home.

A reasonable jury could find there was no consent or exigent circumstances justifying the warrantless entry to arrest Plaintiff for disorderly conduct.[4] As this is a violation of Plaintiff's right to remain free from unreasonable seizure under the Fourth Amendment, the Court must next consider whether this constitutional right was clearly established at the time of his arrest.

### 2) Whether the right was clearly established

The Court does not determine whether a right was clearly established "at a high level of generality"; instead, the Court considers whether the right was "clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Myers v. Potter, 422 F.3d 347, 356 (6th Cir. 2005) (quoting Anderson v. Creighton, 483 U.S. 635, 639–40 (1987)). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." Risbridger v. Connelly, 275 F.3d 565, 569 (6th Cir. 2002). "Government officials, however, can

---

[4] It is conceivable, of course, that Defendants were personally offended by Plaintiff's demands that they leave the premises, that they stop talking to Ms. Shults, that they stop photographing Plaintiff's truck, by Plaintiff continuing to "slam on the police," and by Plaintiffs's refusal to come out of his house after the officers had ordered him to do so. Whether true or not in this case, a law enforcement officer's personal hostility towards a person is never a reason for a warrantless arrest of a defendant inside his home.

be on notice that their conduct violates established law 'even in novel factual circumstances.'"
Taylor v. Mich. Dep't of Natural Res., 502 F.3d 452, 463 (6th Cir. 2007) (quoting Hope v.
Pelzer, 536 U.S. 730, 741 (2002)).

The law of warrantless in-home arrests is well established by Payton and its progeny.
See, e.g., Cummings, 418 F.3d at 687 (finding Payton clearly established that the forced
warrantless entry into a home was presumptively unreasonable). It is clearly established that
such arrests are unconstitutional absent consent to enter or exigent circumstances. Denton, 353 F.
App'x at 6 (citing Atwater, 532 U.S. 318; Payton, 445 U.S. 573). Generally police officers may
arrest suspects for misdemeanors when an officer has probable cause to believe the offense was
committed in his or her presence. Atwater, 532 U.S. at 354. However, this applies only when the
circumstances indicate there is no expectation of privacy protected by the Fourth Amendment,
which expressly affirms the sanctity of the home. U.S. Const. amend. IV. According to
Plaintiff's evidence, Plaintiff was standing inside his home when Defendant Burns initiated his
arrest. As Justice Jackson noted over sixty years ago, "[t]he right of officers to thrust themselves
into a home is . . . a grave concern, not only to the individual but to society which chooses to
dwell in reasonable security and freedom from surveillance." Johnson v. United States, 333 U.S.
10, 14 (1948). It is immaterial whether Plaintiff was yelling or whether his arm crossed the
threshold. More importantly, Plaintiff was reaffirming his earlier demands that Defendants leave
his property alone while standing inside his home. Plaintiff's rights under Payton were clearly
established at the time of his arrest. Accordingly, Defendants cannot enjoy qualified immunity as
to Plaintiff's first claim.

### B) Excessive Force

### *1) Whether there was a constitutional violation*

In his second claim, Plaintiff alleges that Defendants used excessive force during the course of his arrest. When an excessive force claim arises from the context of an arrest, "it is most properly characterized as one invoking the protections of the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 394 (1989). The Fourth Amendment "requires that the officer's use of force be objectively reasonable, balancing the cost to the individual against the government's interest in effecting the seizure." Phelps v. Coy, 286 F.3d 295, 299 (6th Cir. 2002) (citing Graham, 490 U.S. at 394). Under this standard, the Court must consider "the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." Binay v. Bettendorf, 601 F.3d 640, 647 (6th Cir. 2010) (internal quotations omitted). Thus, the Court recognizes "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. (quoting Graham, 490 U.S. at 396–97). "Relevant considerations include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Fox v. DeSoto, 489 F.3d 227, 236 (6th Cir. 2007) (citation and internal quotation marks omitted).

Plaintiff claims that during the course of his arrest, he was:

> (1) grabbed, (2) hit in the face by the door kicked in by Officer Burns, (3) tackled to the floor, (4) maced at point blank range, (5) skulled in the head by a police flashlight, and thereby rendered unconscious temporarily, (6) drug across a concrete porch and steps while handcuffed, (7) tossed into his yard, (8) slammed into a police cruiser, [and] (9) bashed in his head by the door jam of the cruiser when tossed into the back seat of the cruiser . . .

(Doc. # 32). Viewing the evidence in the light most favorable to Plaintiff, the Court must determine in distinct stages whether the force employed was objectively unreasonable. See Bougges v. Mattingly, 482 F.3d 886, 889 (6th Cir. 2007). Therefore, to simplify this analysis, the Court combines Plaintiff's allegations of force into four discrete episodes: (1) the grabbing of Plaintiff, the kicking of the door into Plaintiff's face, and the tackling of Plaintiff; (2) the macing and clubbing of Plaintiff; (3) the dragging of Plaintiff and tossing of Plaintiff into the yard; and (4) the throwing of Plaintiff against the police cruiser and into its door jam.

Leading up to the first episode, Plaintiff and Defendants recall quite different scenarios. Plaintiff claims that he was ambushed by Defendant Burns as he stood inside his backdoor, yelling and gesturing at Defendant Jones. Plaintiff asserts that Defendant Burns grabbed his arm without warning, kicked the door into his face, and tackled him to the ground. Plaintiff denies knowing that Defendant Burns was near the door, and Shults accuses Defendant Burns of unscrewing their porch light and hiding in the dark. Meanwhile, Defendants contend that Plaintiff knew both officers were at his door and that Plaintiff had been swearing at them before Defendant Burns initiated the arrest. Defendants also claim that Plaintiff was making obscene and threatening gestures at his neighbors and Defendants and had threatened to kill his alleged assailants from Banana Joe's. However, Plaintiff denies ever threatening to return to the bar to kill anyone. Shults denies that Plaintiff ever made obscene gestures towards their neighbors or Defendants and that he ever threatened their neighbors or Defendants. Although Defendant Burns maintains that he only followed Plaintiff inside after Plaintiff pulled away, Plaintiff asserts that he was knocked inside by the force of Defendant Burns.

Viewing the evidence produced in the light most favorable to Plaintiff, this episode of force was objectively unreasonable. The crime at issue—disorderly conduct—is relatively minor and nonviolent. Also, Plaintiff's risk of harming anyone at this point was minimal, or at the very least, was a disputed material fact.. Shults claims that Plaintiff never threatened their neighbors or Defendants, and Plaintiff denies ever threatening to kill anyone at the bar. Finally, Plaintiff denies waving a bloody arm around Defendant Burns and claims that his arm was no longer bleeding after the medics bandaged it. However, even if his arm was bleeding, it is odd that Defendant Burns would use that safety risk to justify initiating a forceful arrest by grabbing that very arm. Finally, Plaintiff could not have been resisting arrest at the hands of Defendant Burns if he was unaware Defendant Burns was nearby. Although Defendant Burns claims Plaintiff pulled away inside his home, Plaintiff maintains that he was knocked inside when Defendant Burns kicked the door into his face. Therefore, viewing the evidence produced in the light most favorable to Plaintiff, a reasonable jury could find that this was an unconstitutional use of excessive force.

The second episode occurred on the floor of Plaintiff's kitchen. Plaintiff claims that while beneath Defendant Burns, he was maced at point-blank range and that he was clubbed several times in the head with a flashlight after he "had somehow squirmed out from underneath" the officer. (McCoy Dep. p. 40). Allegedly this incident rendered Plaintiff unconscious. Defendants maintain that Plaintiff was actively resisting arrest by "thrashing around, trying to get away, kicking with his legs and throwing his arms around." (Burns Aff. ¶ 14). Defendant Burns claims he was concerned to be in the kitchen "due to the presence of knives and other potentially life

threatening implements" and that Plaintiff had a ball bat. (Id.). Shults specifically denies that Plaintiff was kicking and throwing his arms about.

Again, the Court is hesitant to find any use of force objectively reasonable given the minor underlying offense. On the other hand, Defendants are able to point to more evidence here suggesting an increased safety risk due to Plaintiff's potential proximity to weapons. However, according to Shults, Plaintiff was not kicking or throwing about his arms. Additionally, any increased safety risk and the threat of resistence was offset by the fact that Defendant Burns was holding Plaintiff to the ground with Defendant Jones nearby. Viewing the evidence produced in the light most favorable to Plaintiff, although some force may well have been justified, a reasonable jury could find that the overwhelming impact of spraying chemicals in one's face and clubbing one unconscious with a blunt object was objectively unreasonable in this instance. Cf. Bougges, 482 F.3d at 891(holding that "resisting arrest by wrestling oneself free from officers and running away would justify the use of *some* force to restrain the suspect").  At some point during the third episode, Plaintiff regained consciousness. Plaintiff claims that Defendants handcuffed one of his arms and dragged his body through the kitchen, over a protruding threshold, and across a concrete porch before throwing him into his yard. It is unclear when Plaintiff came to. Although Defendants do not specifically deny these actions, Plaintiff acknowledges that he attempted to pull back from the officers during this episode. It appears that Defendants had every opportunity to completely handcuff Plaintiff before dragging him outside. Defendant Jones even admits that Defendants "got control of McCoy in the hallway and were able to secure him in handcuffs." (Jones Aff. Ex. 1).  Additionally, under the facts alleged by Plaintiff, Plaintiff does not appear to have posed a great safety or flight risk, particularly when he

was unconscious. "The gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional." Roberts v. Manigold, 240 F. App'x 675, 677 (6th Cir. 2007). But regardless of whether Plaintiff was partially or completely handcuffed, Defendants appear to have been exercising substantial, overpowering control over Plaintiff while they were dragging him outside. Furthermore, it is unclear what governmental interest—if any—was served by tossing Plaintiff off the porch and away from Defendants. Again mindful of the underlying offense, viewing the evidence produced in the light most favorable to Plaintiff, a reasonable jury could find that Defendants employed objectively unreasonable force during this episode.

Finally, the fourth episode occurred after Plaintiff was thrown to the ground and had "tried to get away a little bit." (McCoy Dep. p. 41). Plaintiff claims that Defendants slammed him against a police cruiser, cuffed his second hand, and then threw him so that his head hit the cruiser's door jam. Defendants fail to account for this episode beyond their blanket assertion that they used reasonable force to subdue a resisting suspect.

Having just regained consciousness and lying in his yard, it is unclear what safety threat Plaintiff posed to Defendants. Additionally, Plaintiff admits only trying "to get away a little bit." Although this minimal resistance may have justified the use of some force, allegedly slamming Plaintiff against the cruiser twice was objectively unreasonable. Viewing the evidence produced in the light most favorable to Plaintiff, this force appears, more than anything, retaliatory. Given the underlying offense, a reasonably jury could find that Defendants subjected Plaintiff to objectively unreasonable force in this instance as well. Therefore, enough evidence has been produced for a reasonable jury to find that Defendants deprived Plaintiff of his constitutional

right to remain free from excessive force in each episode. The Court finally turns to whether this constitutional right was clearly established in each use of force.[5]

### 2) Whether these rights were clearly established

The Sixth Circuit "has held that the right to be free from excessive force is a clearly established Fourth Amendment right." Neague v. Cynkar, 258 F.3d 504, 507 (6th Cir. 2001). See also Saucier, 533 U.S. at 201–02 (observing "there is no doubt that Graham v. Connor clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness"). Additionally, case law in this circuit has clearly established "the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." Griffith v. Coburn, 473 F.3d 650, 659 (6th Cir. 2007). See also Wysong v. City of Heath, 260 F. App'x 848, 856 (6th Cir. 2008) ("The same cases holding that police may not use force on a subdued, non-resisting subject hold that the right to be free from physical force when one is not resisting the police is a clearly established right.").

During the first episode, it appears Plaintiff was neither resisting arrest nor posing a safety risk to the police when viewing the evidence produced in the light most favorable to Plaintiff. Under these facts, the grabbing of Plaintiff's arm, the kicking of the door into his face, and the tackling of Plaintiff to the ground were violations of Plaintiff's clearly established rights to remain free from gratuitous force during arrest and to be free from force when one is not resisting. See Griffith, 473 at 659; Wysong, 260 F. App'x at 856.

During the second episode, it appears Defendant Burns had subdued Plaintiff when viewing the evidence produced in the light most favorable to Plaintiff. Even though Plaintiff

---

[5] Arriving at this conclusion, the Court need not discuss whether Plaintiff was justified in resisting arrest and Defendants' arguments in response.

29

admits he "somehow squirmed out from underneath" Defendant Burns, without more the use of chemical spray and the clubbing of his head multiple times with a flashlight appear gratuitous, particularly given the presence of both Defendants. Therefore, viewing the evidence produced in the light most favorable to Plaintiff, this was a violation of a clearly established constitutional right. Cf. Adams v. Metiva, 31 F.3d 375, 387 (6th Cir. 1994) (holding that a "reasonable person would know that spraying mace on a blinded and incapacitated person . . . would violate the right to be free from excessive force.").

During the third episode, Plaintiff could not have posed a safety risk or have been resisting arrest while he was unconscious, and posed only a minimal flight risk once he came to when viewing the evidence in the light most favorable to Plaintiff. Regardless, it appears Defendants had completely subdued Plaintiff if they were able to drag him outside in one handcuff and toss Plaintiff into his yard. The Sixth Circuit has "consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right." Champion v. Outlook Nashville, Inc., 380 F.3d 893, 902 (6th Cir. 2004) (citing Phelps, 286 F.3d at 301 ("There was simply no governmental interest in continuing to beat Phelps after he had been neutralized, nor could a reasonable officer have thought there was.")). Therefore, viewing the evidence produced in the light most favorable to Plaintiff, this was a violation of a clearly established constitutional right.

This same analysis applies to the fourth episode of force as well. Even though Plaintiff admits he "tried to get away a little bit" after he was thrown off the porch, viewing the evidence produced in the light most favorable to Plaintiff, throwing Plaintiff against the cruiser twice was gratuitous. Additionally, if Plaintiff was handcuffed and searched for weapons, any subsequent

force would have been a violation of a clearly established constitutional right. See Roberts, 240

F. App'x at 677 (6th Cir. 2007). Therefore, in each episode, Plaintiff alleges violations of his

clearly established constitutional right to remain free from excessive force. Accordingly,

Defendants also cannot enjoy qualified immunity as to Plaintiff's second claim.

**IV) Conclusion**

For the reasons stated above, Defendants are not entitled to qualified immunity with

respect to either of Plaintiff's two claims. Thus as Defendants are not entitled to judgment as a

matter of law, the Court **DENIES** their motion for summary judgment.


**IT IS SO ORDERED.**


Date:   **November 17, 2010**                    **/s/ John D. Holschuh**
                                              John D. Holschuh, Judge
                                              United States District Court